# In the United States Court of Federal Claims

No. 03-654
Filed: June 26, 2025
Reissued: July 16, 2025[1]

_____

|  |  |
|---|---|
| ROLF HAZLEHURST, Parent and Conservator for WILLIAM YATES HAZLEHURST, | ) ) ) |
| *Petitioner*, | ) ) ) |
| v. | ) ) ) |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | ) ) ) |
| *Defendant*. | ) ) ) ) |

_____

*Rolf G.S. Hazlehurst*, Children's Health Defense, Jackson, TN, for Petitioner, with whom was Kimberly M. Mack Rosenberg, Mack Rosenberg Law LLC, Princeton, NJ, *of counsel*.

*Voris Edward Johnson, Jr.*, Assistant Director, United States Department of Justice, Torts Branch, Civil Division, Washington, D.C., with whom were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *C. Salvatore D'Alessio*, Director, Torts Branch, Civil Division, *Heather L. Pearlman*, Deputy Director, Torts Branch, Civil Division, and *Alexis B. Babcock*, Assistant Director, Torts Branch, Civil Division.

## OPINION AND ORDER

**MEYERS, Judge**.

Many cases have come to this court alleging that certain vaccines cause autism. These cases were initially handled in omnibus proceedings with different test cases presenting different causation theories. This case was one of the test cases regarding whether the Measles-Mumps-Rubella ("MMR") vaccine caused autism. In 2009, this court entered judgment on behalf of the United States, and the Federal Circuit affirmed that judgment. In fact, the Government won virtually all autism cases brought to the court.

Now, 16 years later, the Petitioner contends that the United States got those judgments through a coordinated series of frauds on the court and seeks to set aside the judgment. The crux of the alleged fraud is that the Government concealed that one of its experts thought vaccines

_____

[1] The court previously issued this Opinion and Order to the Parties on June 26, 2025, and, pursuant to Vaccine Rule 18(b), gave them 14 days to propose redactions. Because they did not propose any, the court reissues this Opinion and Order in its entirety.

could cause autism and made false representations to the court that he did not.  Because the Petitioner has failed to carry his heavy burden of establishing fraud on the court, the court denies his motion for relief from the final judgment.

To be clear, the Petitioner's motion does not call on this court to consider the veracity of his belief that a vaccination caused his autism.  The court has no doubt that his belief is sincere.  And there are certainly persistent voices in the scientific and political arenas that continue to assert that vaccines cause or contribute to autism.  Whatever the merit of these arguments, they are not the issue before this court today.  The court today addresses only whether the United States Department of Justice committed a fraud on the court to prevail in this case.  It did not.

## I.    Background

### A.    The National Childhood Vaccine Injury Act

The 20th century witnessed remarkable progress in public health.  One of its "greatest" achievements was "the elimination of communicable diseases through vaccination." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 226 (2011) (citations omitted); H.R. Rep. No. 99-908, at 4 (1986) (explaining that the "[v]accination of children against deadly, disabling, but preventable infectious diseases has been one of the most spectacularly effective public health initiatives this country has ever undertaken[,] . . . prevent[ing] thousands of children's deaths each year and [saving] [b]illions of medical and health-related dollars").

In fact, the vaccination regime became "so effective in preventing infectious diseases that the public became less alarmed at the threat of those diseases, and much more concerned with the risk of injury from the vaccines themselves." *Bruesewitz*, 562 U.S. at 226 (footnote omitted); *see also Terran v. Sec'y of Health & Hum. Servs.*, 195 F.3d 1302, 1306–07 (Fed. Cir. 1999) (noting the "risk" that "[c]hildhood vaccinations . . . can cause serious [although relatively rare] adverse effects"), *cert. denied sub nom. Terran v. Shalala*, 531 U.S. 812 (2000).  So began "a massive increase in vaccine-related tort litigation." *Bruesewitz*, 562 U.S. at 227.  That litigation created concerns that litigation costs and the potential financial liability might drive manufacturers from the vaccine market altogether. *Terran*, 195 F.3d at 1307.  To make matters worse, aggrieved families struggled to get compensation for legitimate vaccine-related injuries. *Bruesewitz*, 562 U.S. at 227 (citations omitted).  These concerns "threatened to depress vaccination rates[,] . . . a source of concern to public health officials, [because] vaccines are effective in preventing outbreaks of disease only if a large percentage of the population is vaccinated." *Id.*

Congress responded with the National Childhood Vaccine Injury Act of 1986 (the "Vaccine Act" or "Act").  42 U.S.C. §§ 300aa-1–300aa-34.  The Act worked to stabilize the vaccine market by reducing litigation risks and encouraging the development of safer vaccines. H.R. Rep. No. 99-908, at 4 (1986) ("[T]he Committee expects that a greater number of manufacturers will enter the vaccine market and that a greater number of vaccine products will become available to prevent disease, reduce reactions, and otherwise improve public health.").

To achieve these objectives, the Act (1) created the Office of Special Masters ("OSM") within the United States Court of Federal Claims, and (2) established the National Vaccine

Injury Compensation Program ("NVICP"). *See* 42 U.S.C. §§ 300aa-10(a), -12(c). The NVICP is a "no-fault compensation program 'designed to work faster and with greater ease than the civil tort system.'" *Bruesewitz*, 562 U.S. at 228 (quoting *Shalala v. Whitecotton*, 514 U.S. 268, 269 (1995)). People injured by vaccines need not prove a product defect or inadequate labeling to receive compensation, as a normal tort action would require. At its core, the Act aimed for a quick, straightforward adjudication process. *Id.*

The Act's Vaccine Injury Table facilitates the quick adjudication of many of these claims. The Secretary maintains a table that identifies for each covered vaccine the common compensable injuries and the timeframe of onset of symptoms following vaccination. These are known as "Table" injuries. 42 U.S.C. § 300aa-14; *Bruesewitz*, 562 U.S. at 228. "Claimants who show that a listed injury first manifested itself at the appropriate time are prima facie entitled to compensation." *Bruesewitz*, 562 U.S. at 228 (citing 42 U.S.C. §§ 300aa-11(c)(1), -13(a)(1)(A)). Claimants with Table injuries need not prove causation; it is assumed once the claimant identifies the vaccination and establishes the onset of symptoms within the appropriate time after vaccination.

If, however, the claimed injury is not a Table injury or did not occur within the specified time frame, claimants must prove causation (these are known as "Off-Table" injuries). 42 U.S.C. § 300aa-11(c)(1)(C)(ii); *Bruesewitz*, 562 U.S. at 228–29. Successful claimants receive compensation for several categories of damages. 42 U.S.C. § 300aa-15. Attorney's fees are provided, too. *Id.* § 300aa-15(e). Awards are paid via a fund created by excise taxes levied on each vaccination. *Id.* § 300aa-15(i)(2). The Act was "designed to stabilize the vaccine market." *Bruesewitz*, 562 U.S. at 229. Vaccine manufacturers now possess "significant tort-liability protections," including general immunity from liability for certain injuries, provided they comply with applicable regulatory requirements and issue appropriate warnings. *Id.* (citing 42 U.S.C. § 300aa-22(b)–(c)).

So, to receive compensation under the Act, a petitioner must demonstrate, by a preponderance of the evidence, that he or she received a covered vaccine and either (1) suffered a Table injury within the requisite time frame, or (2) suffered an injury or aggravation of a preexisting injury or condition not on the Table "'but which was caused' by a covered vaccine."[2] *Canuto v. Sec'y of Health & Hum. Servs.*, 660 F. App'x 955, 957 (Fed. Cir. 2016) (emphasis omitted) (quoting 42 U.S.C. §§ 300aa-11(c)(1)(C), -14; 42 C.F.R. § 100.3).

_____

[2] To prove actual causation, petitioners must, by a preponderance of the evidence, demonstrate "that the vaccination brought about [the] injury." *Althen v. Sec'y of Health Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005). They must provide "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Id.* A petitioner must prove causation "by medical literature or by the medical opinion of an expert witness. If the petitioner meets this burden, they are entitled to recover under the Vaccine Act unless the government is able to prove—by preponderant evidence—that the injury was caused by factors unrelated to the vaccination." *Canuto*, 660 F. App'x at 957 (citations omitted).

### B.     The Omnibus Autism Proceedings

In July 2002, the OSM confronted thousands of petitions alleging that vaccines cause autism.[3]  To efficiently manage these cases, the OSM, with input from counsel representing various petitioners, created the Omnibus Autism Proceedings ("OAP").[4]  *Cedillo v. Sec'y of Health & Hum. Servs.*, 617 F.3d 1328, 1334 (Fed. Cir. 2010); *see also In re Claims for Vaccine Injs. Resulting in Autism Spectrum Disorder or a Similar Neurodevelopmental Disorder*, 2002 WL 31696785, at *1 (Fed. Cl. Spec. Mstr. July 3, 2002) [hereinafter Autism General Order #1]. More than 5,000 petitions made their way to the OAP, the proceedings designed to determine whether a relationship exists between certain vaccines and autism.  *Hazlehurst v. Sec'y of Health & Hum. Servs.*, 604 F.3d 1343, 1345 (Fed. Cir. 2010).  Autism General Order #1 outlined the OAP's background and how it would proceed.

The Chief Special Master, various petitioners' legal counsel, and medical representatives from the Department of Health and Human Services ("HHS") developed the process that would resolve the claims.  Autism General Order #1, at *1–3.  At the outset, the OSM "authorize[d] a team of attorneys to represent the interests of all petitioners"—the Petitioners' Steering Committee ("PSC").  *Id.* at *3.  The PSC requested and received extensive discovery so, in its words, the "science [could] crystalize."  *Id.* at *2.  Such discovery occurred from 2002 to 2006. *See King v. Sec'y of Health & Hum. Servs.*, No. 03-584V, 2010 WL 892296, at *7 (Fed. Cl. Spec. Mstr. Mar. 12, 2010).  The OAP would then move forward in two steps, with Special Master Hastings, Special Master Campbell-Smith, and Special Master Vowell presiding.  *See* Autism General Order #1, at *3 (designating Special Master Hastings to preside over the OAP); *Hazlehurst v. Sec'y of Health & Hum. Servs.*, No. 03-654V, 2009 WL 332306, at *3 (Fed. Cl. Spec. Mstr. Feb. 12, 2009) (explaining that Special Masters Campbell-Smith and Vowell were added to the OAP), *aff'd*, 88 Fed. Cl. 473 (2009), *aff'd*, 604 F.3d 1343 (Fed. Cir. 2010).

In Step 1, the OSM would inquire into the general causation issues in the cases.  That is, "whether the vaccinations in question can cause autism and/or similar disorders, and if so in what circumstances."  Autism General Order #1, at *2.  In Step 2, the OSM would apply the conclusions reached in Step 1 "to decide the specific causation question of whether the received

---

[3] Autism is "a brain disorder affecting a person's ability to communicate, form relationships, and/or respond appropriately to the environment."  *In re Claims for Vaccine Injs. Resulting in Autism Spectrum Disorder or a Similar Neurodevelopmental Disorder*, 2002 WL 31696785, at *1 n.2 (Fed. Cl. Spec. Mstr. July 3, 2002).

[4] Omnibus programs are nothing new.  They have been "used previously in Vaccine Act cases to make causation determinations in groups of cases alleging that a particular vaccine caused a specific injury, but the OAP was, by far, the largest grouping of similar cases."  *R.K. v. Sec'y of Health & Hum. Servs.*, No. 03-0632V, 2015 WL 10911950, at *2 (Fed. Cl. Spec. Mstr. Sept. 28, 2015), *motion for review denied*, 125 Fed. Cl. 57 (2016), *aff'd per curiam*, 671 F. App'x 792 (Fed. Cir. 2016).

vaccinations did cause the autistic condition alleged in each of the individual cases." *Hazlehurst*, 2009 WL 332306, at *2 (emphasis omitted).

To present general causation evidence, the PSC proposed—and the OSM permitted—a test case approach.  The test cases would address three main theories: (1) whether a combination of the MMR vaccine and thimerosal-containing vaccines ("TCVs") could cause autism; (2) whether the MMR vaccine alone could cause autism; and (3) whether TCVs alone could cause autism.  *See* Autism General Order #1, at *5.[5]

Throughout the OAP, a vast body of medical and scientific evidence was produced, "easily . . . the largest of all cases presented to the [c]ourt in the history of the Vaccine Act." *Cedillo v. Sec'y of Health & Hum. Servs.*, 89 Fed. Cl. 158, 167 (2009), *aff'd*, 617 F.3d 1328 (Fed. Cir. 2010).  "[T]he three special masters who heard this evidence [found] that the issue of [vaccine] causation was not a 'close call.'" *Blake v. Sec'y of Health & Hum. Servs.*, No. 03-31V, 2014 WL 2769979, at *14 n.34 (Fed. Cl. Spec. Mstr. May 21, 2014).  They each "independently determined that the medical theories advanced were not reliable and that the test case petitioners had failed to produce preponderant evidence" of causation.  *Id.*  Litigation concluded in 2010, when the Federal Circuit affirmed the dismissal of *Cedillo*.[6]  The court turns now to the details of the OAP test cases.

      1.   <u>Theory 1</u>

The three Theory 1 test cases were *Cedillo*, *Hazlehurst*, and *Snyder*.  The OSM, this court, and Court of Appeals for the Federal Circuit each rejected the PSC's causation theories *Cedillo* and *Hazlehurst*.  *See Cedillo v. Sec'y of Health & Hum. Servs.*, No. 98-916V, 2009 WL 331968 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd*, 89 Fed. Cl. 158 (2009), *aff'd*, 617 F.3d 1328 (Fed. Cir. 2010); *Hazlehurst v. Sec'y of Health & Hum. Servs.*, No. 03-654V, 2009 WL 332306 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd*, 88 Fed. Cl. 473 (2009), *aff'd*, 604 F.3d 1343 (Fed. Cir. 2010).  The OSM and this court rejected the claims in *Snyder*, which was not appealed to the Federal Circuit.  *Snyder v. Sec'y of Health & Hum. Servs.*, No. 01-162V, 2009 WL 332044 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *motion for review denied*, 88 Fed. Cl. 706 (2009).  To provide context for the Petitioner's motion, the court summarizes the Theory 1 test cases.

---

[5] Autism General Order #1 included one specific note, a "caveat," addressed further below, but explained here.  Autism General Order #1, at *6.  Some cases would invariably involve "autistic-like disorders which manifested following an injury defined in the Vaccine Injury Table."  *Id.* For example, "a vaccinee may have suffered an episode involving a severe acute encephalopathy within 72 hours after a pertussis vaccination (DTP or DTaP) [types of TCVs], or 5 to 15 days after an MMR vaccination."  *Id.*  If that happened, "such an acute encephalopathy and any residual effects thereof would be *presumed* to be vaccine-caused pursuant to the Vaccine Injury Table" if "the vaccinee suffered a sudden, dramatic, and severe change in level of consciousness lasting at least 24 hours."  *Id.* (citations omitted).  So the injury would "be processed . . . as a Table injury."  *Id.*

[6] The Federal Circuit affirmed the dismissals of *Hazlehurst* on May 13, 2010, and *Cedillo* on August 27, 2010.

                    *a)*     *Cedillo*

The first test case considered whether a combination of TCVs and the MMR vaccine caused Michelle Cedillo's autism, mental retardation, and seizures. *Cedillo*, 2009 WL 331968, at *1. Michelle was born in 1994. *Id.* at *4. The pregnancy and birth were "uncomplicated," as were her pediatric visits during the first sixteen months of her life. *Id.* She received the routine childhood vaccines, including, at fifteen months, an MMR vaccination. *Id.* One week after the MMR shot, she developed a fever and a rash. *Id.* at *5. The fever eventually rose to 105.7 degrees. *Id.* And she was coughing, gagging, and vomiting. *Id.*

Her pediatrician prescribed antibiotics for either sinusitis or influenza. *Id.* She saw her again a few months later. *Id.* During that appointment, the pediatrician did not note any substantial health concerns, but did remark that Michelle was talking less since before her illness. *Id.* Another month later, the pediatrician suspected "developmental delay." *Id.* Subsequent records confirmed her abnormal development, and Michelle was diagnosed with "severe Autism," "profound mental Retardation," several gastrointestinal problems, and arthritis. *Id.* at *5–6. She also suffered occasional seizures. *Id.* at *6.

The PSC argued that the effects of TCVs and the MMR vaccine caused her to regress. *Id.* at *15. It claimed that the vaccines damaged Michelle's immune system, and "due to her immune deficiency, she was unable to clear from her body the measles virus contained in the MMR vaccine." *Cedillo*, 617 F.3d at 1335. Instead, the "measles virus persisted and replicated," and ultimately "invaded [her] brain," causing inflammation and autism. *Cedillo*, 2009 WL331968, at *65.

Special Master Hastings presided over a hearing from June 11, 2007, to June 26, 2007. *Id.* at *4 n.5. He heard general causation evidence and specific causation evidence. *Id.* at *10. Six expert witnesses testified for the PSC, and nine for DOJ. *Cedillo*, 617 F.3d at 1335. An extensive record amassed. *Cedillo*, 2009 WL331968, at *10. Michelle's medical records comprised nearly 8,000 pages. *Id.* at *14. The hearing transcript was nearly 3,000 pages. *Id.* Also entered in the record were 939 medical journal articles, textbook excerpts, and other medical literature, relating to neurology, gastroenterology, virology, immunology, molecular biology, toxicology, genetics, and epidemiology. *Id.*

The PSC heavily relied on the testimony of Dr. Kinsbourne and his neuroinflammation theory. *Id.* at *16. Dr. Kinsbourne testified that an immune response triggered by the measles component of the MMR vaccine could lead to an increase of pro-inflammatory immune cells in the brain. *Id.* at *65–67. He suggested this caused persistent brain inflammation, resulting in autism. *Id.* Dr. Kinsbourne's theory relied significantly on two "research articles indicating that brain inflammation is present in autism." *Id.* at *69 n.109. The articles were written by Dr. Diana Vargas, Dr. Carlos Pardo, and Dr. Andrew Zimmerman, among others. *Id.* One articles explained that the neuroinflammation research was preliminary in nature, and that the results did not show whether such observed inflammation was harmful or beneficial. *See* ECF No. 120-3 at 4.

(1)    Dr. Andrew Zimmerman

Many of the Petitioner's fraud claims rest on Dr. Zimmerman's role in the OAP, beginning with the *Cedillo* hearing, so the court focuses on his role in that case. *See* ECF No. 118 at 2. DOJ retained Dr. Zimmerman "largely to counter the testimony of Dr. . . . Kinsbourne." ECF No. 123-3 at 4. He submitted an expert report, and DOJ initially identified him as a testifying witness. ECF No. 131 at 8–10.

Start with his expert report. Dr. Zimmerman concluded that there was no credible basis for the theory advanced by the PSC:

> There is no scientific basis for a connection between [the MMR] vaccine or mercury (Hg) intoxication and autism. Despite well-intentioned and thoughtful hypotheses and widespread beliefs about apparent connections with autism and regression, there is no sound evidence to support a causative relationship with exposure to both, or either, MMR and/or Hg. . . .
>
> . . .
>
> Furthermore, there is no evidence of an association between autism and the alleged reaction to MMR and Hg, and it is more likely than not, that there is a genetic basis for autism in [Michelle].

ECF No. 120-3 at 5–7.

Now, for his testimony. To aid in his response, DOJ asked Dr. Zimmerman to attend and observe "on the day Dr. Kinsbourne testified." ECF No. 131 at 8. Dr. Zimmerman did attend when Dr. Kinsbourne testified and the events of this day are at the core of the Petitioner's motion. During a break in the hearing, he met with DOJ attorneys "to clarify [his] written expert opinion." ECF No. 120-5 at 2. He explained in a later declaration that his opinion was "case specific . . . as to Michelle Cedillo" and "not intended to be a blanket statement as to all children and all medical science." *Id.* He believed "that there were exceptions in which vaccinations could cause autism." *Id.* Those exceptions, he said, applied to "a subset of children with an underlying mitochondrial dysfunction." *Id.* In those children, "vaccine induced fever and immune stimulation that exceeded metabolic energy reserves could, and in at least one of [his] patients, did cause regressive encephalopathy with features of" autism. *Id.* Dr. Zimmerman did not reveal the name of said patient, but did reference the case report, *Developmental regression and mitochondrial dysfunction in a child with autism* (the "*Poling* paper"). *Id.* at 3. That patient was Hannah Poling. The court addresses this report, written by Dr. Jon Poling, Dr. Richard Frye, and Dr. Zimmerman, in detail below.

Dr. Zimmerman stated that he told DOJ that it may not want him to testify because of the *Poling* paper. ECF No. 120-6 at 6. DOJ soon after "informed [him] that [he] w[as] no longer needed as an expert witness." *Id.* at 7. DOJ says it decided not to call Dr. Zimmerman to testify because it "was concerned that Dr. Zimmerman's testimony about [the *Poling* paper] would be

distracting, a 'sideshow,' because it was not relevant to the causation theory at issue" and because it "would be redundant, given the expected testimony of other government experts." ECF No. 123-3 at 9. DOJ kept Dr. Zimmerman's written report in the record, "figuring that if the report were withdrawn, it would suggest that Dr. Zimmerman was not called because he had changed his opinion." *Id.* That said, Dr. Zimmerman did not believe that Michelle Cedillo's autism stemmed from mitochondrial dysfunction, as described in the *Poling* paper. *Id.* at 8–9. Further, the PSC's experts in *Cedillo* did not offer the theory that vaccines can cause autism by the theory posited in the *Poling* paper—by significantly aggravating a preexisting mitochondrial disorder. Also, Dr. Zimmerman wrote his *Cedillo* opinion more than one year after he co-authored the *Poling* paper. *Id.* at 8–9. The *Poling* paper was published in February 2006, ECF No. 120-6 at 2, and his expert report was submitted in April 2007, ECF No. 120-3 at 2. Finally, everyone on the "team already knew that Dr. Zimmerman had written the Poling case note and that he believed there were exceptional cases in which vaccinations could cause autism." ECF No. 123-3 at 8.

Special Master Hastings referenced Dr. Zimmerman twice in the *Cedillo* decision. He first pointed to Dr. Zimmerman's statement "that environmental factors 'may' be involved in the causation of autism, in a context that implied *postnatal* factors." *Cedillo*, 2009 WL 331968, at *75. This reference arose in the context of describing the PSC's reports and other testimony. Second, he cited Dr. Zimmerman's expert report for the point that "the evidence does not support the proposition that the MMR vaccine can cause autism." *Id.* at *84 n.135 (emphasis omitted). Dr. Zimmerman's opinion was "far less important than that of the respondent's experts who did testify." *Id.*

<center>(2)    The Special Master's Conclusion</center>

Special Master Hastings rejected all the PSC's arguments, concluding that the evidence was "overwhelmingly [to the] contrary," and that "[t]he expert witnesses presented by [DOJ] were far better qualified, far more experienced, and far more persuasive" than the PSC's. *Id.* at *1, *134. He found the PSC's evidence to be unreliable. *Id.* at *15. And he specifically noted that DOJ's experts expressed "serious concerns" about those studies relied on by Dr. Kinsbourne "that would cast doubt on their purported results." *Cedillo*, 89 Fed. Cl. at 170. As for Dr. Kinsbourne, while "an unquestionably qualified witness, his testimony was unpersuasive. His opinion lacked reliable evidentiary support." *Hazlehurst*, 2009 WL 332306, at *7.[7] In fact, he supplied no evidence for the possibility that "vaccine-strain measles virus plays any role in causing brain inflammation in autistic persons." *Cedillo*, 2009 WL 331968, at *69 n.109 (emphasis omitted). At bottom, the PSC "wholly failed to demonstrate that it is probable that the MMR vaccine can play a role in causing chronic brain inflammation or autism." *Id.* (emphasis omitted). This court and the Federal Circuit affirmed the Special Master's decision. *Cedillo*, 89 Fed. Cl. at 164, *aff'd,* 617 F.3d 1328 (Fed. Cir. 2010).

<center>*b)*    *Hazlehurst*</center>

---

[7] Under the OAP's rules, evidence submitted in one test case would be used in the other test cases. The description of Dr. Kinsbourne's testimony here is of his testimony from *Cedillo* and *Snyder*.

The second test case considered Yates Hazlehurst's autism. *Hazlehurst*, 2009 WL 332306, at *1. The initial petition alleged that the MMR vaccine or a combination of the MMR vaccine and TCVs caused it, but the Special Master's decision focused on whether the MMR vaccine alone caused Yates's autism, because the PSC focused solely on that theory in post-hearing briefing. *Id.* at *1, *161.

Yates received the standard childhood vaccinations during his first twelve months. *Hazlehurst*, 88 Fed. Cl. at 476. Three days before he turned one, he received the MMR vaccine. *Id.* Yates developed normally before that shot. *Id.* But in the month following the vaccination, he became, in his family's words, "wild," "very hyperactive," and "out of control." *Id.* By sixteen months, he "lost all meaningful speech and [] developed an obsession with letters and numbers." *Id.* He "began to experience chronic diarrhea and abdominal pain." *Id.* Dr. Zimmerman evaluated Yates early in his life and diagnosed him with regressive autism. ECF No. 120-9 at 49–50.[8]

The PSC, again, argued the measles component of the MMR vaccine caused an immune dysfunction, resulting in persistent measles infection, chronic gastrointestinal inflammation, neuroinflammation, and autism. *Hazlehurst*, 2009 WL 332306, at *19. The record, again, contained "a wealth of evidence and . . . testimony of a number of experts." *Id.* at *172. There were more than 1,000 medical literature exhibits and fifty combined filed expert reports. *Id.* at *4. Several fact and expert witnesses testified for the PSC, including Dr. Jean-Ronel Corbier, Yates's treating neurologist. *Id.* at *4–6. Remember too that under the structure of the OAP general causation evidence applied to all test cases.

Dr. Corbier posited that a genetic predisposition coupled with environmental insult (TCVs and the MMR vaccine) triggered Yates's autism. *Id.* at *50, *162. Central to his testimony were several studies claiming to detect persistent measles virus in vaccinated autistic children. *Id.* at *162–63. His expert report discussed "genetic-metabolic conditions," ECF No. 120-10 at 10, which the Petitioner says includes mitochondrial dysfunction, because mitochondrial dysfunction is a genetic-metabolic condition. ECF No. 118 at 12.

(1)     Dr. Zimmerman

Dr. Zimmerman played a limited role in the *Hazlehurst* hearing and subsequent decisions. References to him are sparse. During cross-examination of Dr. Corbier, the following exchange occurred:

> Q: And Dr. Zimmerman, he's a pediatric neurologist?
>
> A: That is correct.
>
> Q: He's not an immunologist.

---

[8] Yates was later diagnosed with mitochondrial dysfunction. *See* ECF No. 123-7 at 4–5. Even in those patients with mitochondrial disorder, Dr. Zimmerman still recommended vaccinations. *Id.* at 10.

> A: No, he's a neurologist, but he has studied the immunology of autism.
>
> Q: Do you consider him an authority on the issue [of immunological aspects]?
>
> A: I respect Dr. Zimmerman, and I consider him, yes, one of the authorities, yes.

ECF No. 121-1 at 40.

During closing, a DOJ lawyer made the following statements, that the Petitioner here takes exception to:

> I did want to mention one thing about an expert, who did not appear here, but his name was mentioned several times, and that was Dr. Zimmerman.
>
> Dr. Zimmerman actually has not appeared here, but he has given evidence on this issue, and it appeared in the [*Cedillo*] case. I just wanted to read briefly because his name was mentioned several times by Petitioners in this matter. What his views were on these theories, and I'm going to quote from Respondent's Exhibit FF in the [*Cedillo*] case, which is part of the record in this case as I understand it[:]
>
>> "There is no scientific basis for a connection between measles, mumps and rubella MMR vaccine or mercury intoxication in autism despite well-intentioned and thoughtful hypothesis and widespread belief about the apparent connection with autism and regression. There's no sound evidence to support a causative relationship with exposure to both or either MMR and/or mercury."
>
> We know his views on this issue.

ECF No. 121-4 at 4–5.

Dr. Zimmerman later stated that it was "highly misleading" for DOJ attorneys to "continue to use [his] original written expert opinion, as to Michelle Cedillo, as evidence against the remaining" OAP petitioners, given what he told them about the mitochondrial dysfunction theory. ECF No. 120-5 at 4–5. He believed it was not an accurate reflection of his opinion. ECF No. 120-6 at 9–10.

(2)    The Special Master's Conclusion

The Special Master referenced Dr. Zimmerman's expert report once. She explained his opinion that "'there is no scientific basis for a connection' between the MMR vaccination, mercury intoxication, and autism," and then stated that she relied "more heavily on the testimony and reports of the experts who were observed and heard during the hearings." *Hazlehurst*, 2009 WL 332306, at *4 n.16.

In so doing, the Special Master found the studies on which Dr. Corbier relied flawed and unreliable due to methodological weaknesses and compromised testing systems. *Id.* at *132, *136, *150. So Dr. Corbier's opinion regarding the existence of persisting measles virus in the gut tissue of autistic children "could not be credited as sound or reliable." *Id.* at *13. And thus, the PSC's theory of causation was "premised upon a series of biological implausibilities." *Id.* at *149. As in *Cedillo*, the Special Master found the witnesses either unpersuasive, ineffective, or unqualified due to unsound science or poor demeanor. *See, e.g.*, *id.* at *7. And like *Cedillo*, the Special Master found DOJ's witnesses credible, effective, and persuasive. *See, e.g.*, *id.* at *8. This court affirmed the OSM's decision, and the Federal Circuit affirmed as well. *See Hazlehurst*, 88 Fed. Cl. at 490, *aff'd*, 604 F.3d 1343 (Fed. Cir. 2010).

### (3)   Oral Argument at the Federal Circuit

During oral argument on appeal, the following exchange occurred between the Federal Circuit and DOJ:

> [Q:] But isn't one of the things that the Government needs to think about, and HHS, is whether, in fact, do you need the 95 percent statistical probability? Do you need, at this stage, the more likely than not, or would it suffice – or should it suffice, at this stage, if it shown to be medically, therapeutically, scientifically possible as one proceeds to develop the causal relationship by enhanced procedures and the increased knowledge that are being gleaned of what happens inside the body and the cell?
>
> [A:] Well, there's a lot to your question, Your Honor, but I would say, at this stage, it – we're not even at the stage where it's medically or scientifically possible. This is not a field of science that is bereft of research. Studies have been done looking at the causal connection between autism and MMR, autism and Thimerosal, and every credible study has shown that there is no causal connection.

ECF No. 122-6 at 3–4. The Petitioner challenges the DOJ lawyer's answer, addressed below.

### c)   *Snyder*

The third Theory 1 test case considered Colten Snyder's autism. *See Snyder*, 2009 WL 332044, at *1. The PSC presented the same general causation theory. Colton was developing normally before receiving a combination of TCVs and the MMR vaccine, and those vaccines impaired the effective functioning of his immune system. This impaired functioning allowed the measles component of the MMR vaccine to persist causing chronic inflammation in his, which

led to regressive autism. *Id.* at *28. The PSC presented Dr. Kinsbourne and Dr. Corbier as two of their expert witnesses. *See id.* at *11. The neuroinflammation theory again was offered. *Id.* at *87.

Special Master Vowell rejected the claims on similar grounds to *Cedillo* and *Hazlehurst*. *See id.* at *1 (explaining that the PSC's "theories of causation were speculative and unpersuasive," and "[r]espondent's experts were far more qualified, better supported by the weight of scientific research and authority, and simply more persuasive on nearly every point in contention"). She did reference Dr. Zimmerman several times, and "relied on his [*Cedillo*] report in considering the relative merits of various interpretations of his research findings." *Id.* at *16. These references simply noted Dr. Zimmerman's points in response to the PSC's witnesses' points or cited to various papers he has authored. *See id.* at *49, *102, *204. She also explained that Dr. Zimmerman's report "clearly indicated that he did not believe the MMR vaccine to be causal of autism." *Id.* at *94 n.295.

Having explained the Theory 1 test cases, the court briefly turns to the rest of the OAP.

### 2. Theory 2

The three Theory 2 test cases were heard in 2008. *See Dwyer v. Sec'y of Health & Hum. Servs.*, No. 03-1202V, 2010 WL 892250 (Fed. Cl. Spec. Mstr. Mar. 12, 2010); *King*, 2010 WL 892296; *Mead v. Sec'y of Health & Hum. Servs.*, No. 03-215V, 2010 WL 892248 (Fed. Cl. Spec. Mstr. Mar. 12, 2010).

Dr. Kinsbourne again served as a causation expert for the PSC. *See, e.g., Dwyer*, 2010 WL 892250, at *5. This time, his neuroinflammation theory focused on the mercury contained in thimerosal, rather than measles in the MMR vaccine.[9] *See id.* at *142. He again relied on Dr. Pardo's research, *id.* at *150, who again provided a letter that echoed concerns about misuse of his research: "[I]t 'is important to clarify the notion that neuroinflammatory responses are directly associated with injury. At present, we are not able to conclude that these neurological reactions are deleterious for the central nervous system.'" *King*, 2010 WL 892296, at *41 (alterations omitted). The neuroinflammation may be in fact beneficial, and "[i]t is erroneous to assign . . . an exclusive deleterious or injury effect of those neurological responses in the CNS." *Id.* The OSM rejected the presented causation theory that TCVs alone can cause autism. *See, e.g., id.* at *1. The PSC did not seek review.

### 3. Theory 3

The PSC decided not to pursue its third theory—that the MMR vaccine alone causes autism—because it was addressed in the Theory 1 cases.

---

[9] Dr. Zimmerman did not serve as an expert in the Theory 2 test cases, and his *Cedillo* opinion was not part of the record.

4.    The *Poling* Paper and Case

Recall that Dr. Zimmerman, during the *Cedillo* hearing, spoke with DOJ about a case report he co-authored. ECF No. 120-5 at 3. That report, published more than one year before the *Cedillo* hearing, analyzed a child named Hannah Poling. *See* ECF No. 120-6 at 44.[10] Hannah had been diagnosed with regressive autism and a mitochondrial disorder. *Id.* at 45. She suffered seizures, too. *Id.* The paper posited that vaccinations aggravated her mitochondrial disorder, possibly triggering or contributing to her regressive autism.[11] *Id.* at 46.

Hannah's parents opted into the OAP. They sought compensation for her autism and seizures. *See Poling v. Sec'y of Health & Hum. Servs.*, No. 02-1466V, 2008 WL 1883059 (Fed. Cl. Spec. Mstr. Apr. 10, 2008). The PSC designated her case as a possible Theory 2 test case (whether TCVs alone can cause autism). ECF No. 120-8 at 3. After reviewing Hannah's medical records, DOJ concluded that her condition met the statutory criteria for compensation because she experienced symptoms of a developmental regression within forty-eight hours of receiving a DTaP vaccine and within five to fifteen days of a measles vaccine. *See* ECF No. 121-5 at 2–3, 7. Those symptoms met the Table requirements for a DTaP encephalopathy and measles Table encephalopathy. *See* Autism General Order #1, at *6.

Because DOJ concluded her condition merited compensation, it filed a Rule 4 report on November 9, 2007.[12] ECF No. 121-5 at 1. The report explained that Hannah's case met the statutory requirements under 42 U.S.C. § 300aa-11(c)(1)(C)(ii). *Id.* at 7. That provision addresses compensation for injuries caused by a vaccine on the schedule but that were either not on the Vaccine Injury Table or did not occur within the relevant time period. 42 U.S.C. § 300aa-11(c)(1)(C)(ii). The Polings and DOJ, however, disagreed about whether Hannah's seizures stemmed from her vaccines. ECF No. 121-5 at 7. So Dr. Zimmerman filed a report on November 30, 2007, which opined that her seizures stemmed from the vaccines and that TCVs can cause regressive autism in children with mitochondrial disorders, like Hannah. ECF No. 121-7 at 5–6. The report also concluded that "the cause of the regressive encephalopathy in Hannah . . . was underlying mitochondrial dysfunction." *Id.* at 6.

___

[10] The record contains a copy of the paper, which can be found at the following citation: Jon S. Poling, Richard E. Frye, John Shoffner, Andrew W. Zimmerman, *Developmental regression and mitochondrial dysfunction in a child with autism*, 21 J. Child Neurology 170–72 (2006). The authors of the *Poling* paper were widely criticized. The Editor-in-Chief of the Journal of Child Neurology was frustrated because the child analyzed was one of the author's children, and that there was a pending Vaccine Act compensation claim. *See R.K.*, 2015 WL 10911950, at *16.

[11] The paper was listed on Dr. Zimmerman's CV submitted by DOJ. ECF No. 120-2 at 7. The paper was filed as an exhibit in June 2007—the middle of the *Cedillo* hearing, and four months before the *Hazlehurst* hearing began. Furthermore, the PSC itself entered the report into the record. ECF No. 123-3 at 20.

[12] Vaccine Rule 4 requires DOJ and HHS "file a report setting forth a full and complete statement of its position as to why an award should or should not be granted."

13

DOJ then filed a supplemental Rule 4 report on February 21, 2008, conceding vaccine injury caused her seizures, also under 42 U.S.C. § 300aa-11(c)(1)(C)(ii).  *Poling v. Sec'y of Health & Hum. Servs.*, No. 02-1466 (Fed. Cl. Spec. Mstr. Feb. 21, 2008), ECF No. 27.  HHS also filed a memorandum in the case.  *Poling*, No. 02-1466, ECF No. 52.

The Parties have expended a lot of ink on the basis for the *Poling* concession—i.e., whether the Government conceded it as an Off-Table case (meaning that the Polings proved causation) or a Table case in which the Government presumed causation.  Their disagreement stems largely from the fact that the initial Rule 4 report was leaked.  ECF No. 131 at 18.  Disclosure, however, was barred by statute unless both parties consented.  42 U.S.C. § 300aa-12(d)(4)(A).  After the leak, the Polings moved for "Complete Transparency of the Proceedings," arguing that the parties or their representatives should be able "to freely discuss with any person each and every aspect of [the *Poling*] case, including details of the Respondent's concession that Hannah is entitled to compensation for her vaccine-related injuries, including her autism."  ECF No. 121-10 at 4–5.  In *Poling*, Special Master Campbell-Smith (who presided over the *Poling* case as well as this case) deferred ruling on the motion for sixty days.  *Id.* at 1.  She considered the motion moot because of the "unauthorized disclosure," and deferred ruling on the motion to allow time for the parties to come to an agreement.  *Id.* at 20–21.  No agreement was reached.  According to the Petitioner here, DOJ "change[d] the basis of compensation from [cause-in-fact], in which causation must be proven by [a preponderance of the evidence], to a [presumptive] 'table injury,' in which causation is presumed."  ECF No. 118 at 36.

In the end, Special Master Campbell-Smith—who was fully aware of the dispute and had all of the filings before her—issued a decision in *Poling* awarding attorney's fees and costs.  In it, she concluded that the Government settled *Poling* as a Table injury:

> Respondent conceded that petitioners are entitled to compensation based on a determination that [the minor child] suffered an injury identified on the Vaccine Injury Table, specifically, a presumptive MMR vaccine-related injury of an encephalopathy.  [The child's] encephalopathy eventually manifested as a chronic encephalopathy with features of an autism spectrum disorder and a complex partial seizure disorder as a sequel[a].

*Poling v. Sec'y of Health & Hum. Servs.*, No. 02-1466V, 2011 WL 678559, at *1 (Fed. Cl. Spec. Mstr. Jan. 28, 2011) (internal footnote omitted).  In other words, the *Poling* case "was compensated based on the presumption of causation that attaches when the Table injury requirements are met, not on an actual causation or causation in fact basis."  *R.K.*, 2015 WL 10911950, at *17 (emphasis omitted).

## C.    Post-OAP Cases Involving Dr. Zimmerman's Mitochondrial Theory

Several cases have explored the theory expressed in the *Poling* paper that vaccines aggravated pre-existing mitochondrial dysfunction, resulting in encephalopathy and autism.  For example, in *R.K.*, the petitioners claimed that the child's two flu vaccines "either resulted in an encephalopathy or significantly aggravated an existing condition [mitochondrial disorder] related to prior vaccinations."  *R.K. v. Sec'y of Health & Hum. Servs.*, No. 03-0632V, 2015 WL

10936124, at *1 (Fed. Cl. Spec. Mstr. Sept. 28, 2015). The petitioners could not show any such condition existed. *Id.* at *7. Moreover, "the evidence that mitochondrial deterioration can be linked . . . to vaccines" was tenuous at best. *Id.* at *80. "[I]t was abundantly clear that petitioners' theories of causation were speculative and unpersuasive. Respondent's experts were far more qualified, better supported by the weight of the scientific research and authority, and simply more persuasive on nearly every point in contention." *Id.* at *7. This court and the Federal Circuit affirmed. *R.K. v. Sec'y of Health & Hum. Servs.*, 125 Fed. Cl. 57, 73 (2016), *aff'd*, 671 F. App'x 792 (Fed. Cir. 2016).

Dr. Zimmerman testified in *Madariaga* v. *Secretary of Health & Human Services*, No. 02-1237V, 2015 WL 6160215 (Fed. Cl. Spec. Mstr. Sept. 26, 2015). The Special Master specifically rejected the mitochondrial hypothesis. *See id.* at *1. There was no evidence "other than the anecdotally based opinions of Dr. Zimmerman" demonstrating that illnesses causing regression in children with mitochondrial disorders result in autism. *Id.* at *86. The Special Master explicitly stated, "[t]here is simply no credible evidence that inflammation caused by vaccination plays a role in the development of regression and/or mitochondrial autism in children with mitochondrial dysfunction." *Id*. And in *Murphy v. Secretary of Health & Human Services*, Dr. Zimmerman appeared as a witness. No. 05-1063V, 2016 WL 3034047, at *15–16 (Fed. Cl. Spec. Mstr. Apr. 25, 2016), *motion for review denied*, 128 Fed. Cl. 348 (2016). The court did not find the mitochondrial hypothesis persuasive. *See id.* at *39; *see also Reed v. Sec'y of Health & Hum. Servs.*, No. 08-650V, 2018 WL 6844458, at *86 (Fed. Cl. Spec. Mstr. Dec. 4, 2018) (rejecting the mitochondrial hypothesis).

Other cases in which Dr. Zimmerman did not testify have similarly rejected the claim that vaccines cause autism by aggravating underlying mitochondrial disorders. *See Miller v. Sec'y of Health & Hum. Servs.*, No. 02-235V, 2015 WL 5456093, at *41 (Fed. Cl. Spec. Mstr. Aug. 18, 2015) (noting the lack of "any reliable evidence that [the quantities of alleged 'toxins' in vaccines] could cause mitochondrial dysfunction, impair mitochondrial dysfunction" or cause autism to occur); *R.V. v. Sec'y of Health & Hum. Servs.*, No. 08-504V, 2016 WL 3882519 (Fed. Cl. Spec. Mstr. Feb. 19, 2016) (dismissing claims that an influenza vaccine caused encephalopathy or aggravated a mitochondrial disorder, resulting in developmental regression), *aff'd*, 127 Fed. Cl. 136 (2016), *appeal dismissed*, No. 16-2400, 2016 WL 11949917 (Fed. Cir. Oct. 26, 2016).

There is one case to the contrary: *Paluck v. Secretary of Health & Hum. Services*, 786 F.3d 1373 (Fed. Cir. 2015). The Palucks alleged that vaccinations (including the MMR vaccine) administered to their son, K.P., significantly aggravated his underlying mitochondrial disorder, resulting in regressive autism. *Id.* at 1376–77. Dr. Frye, an expert for the Palucks and co-author of the *Poling* paper, testified that mitochondrial disorders impair cellular energy production, making patients vulnerable to oxidative stress that could exacerbate mitochondrial dysfunction and lead to neurological injury. *Id.* at 1377–81. Dr. Frye explained that this neurological deterioration occurs in two stages: first, an acute immune response, typically feverish and symptomatic within days post-vaccination; second, a longer-term progressive neurodegeneration unfolding over weeks and months, influenced heavily by the underlying mitochondrial vulnerability. *Id.* at 1381. The Special Master initially rejected Dr. Frye's testimony, asserting that he failed to present a plausible medical theory linking K.P.'s mitochondrial dysfunction to vaccine-induced injury, and imposed a two-to-three-week timeline for symptom onset. *Paluck v.*

*Sec'y of Health & Hum. Servs.*, No. 07-889V, 2011 WL 6949326, at *2, *26–27 (Fed. Cl. Spec. Mstr. Dec. 14, 2011), *vacated*, 104 Fed. Cl. 457 (2012), *aff'd*, 786 Fed.3d 1373 (Fed. Cir. 2015).

This court vacated and remanded the case because the Special Master had imposed a heightened evidentiary burden beyond what the Vaccine Act requires. *Paluck v. Sec'y of Health & Hum. Servs.*, 104 Fed. Cl. 457, 480 (2012). Judge Lettow said Dr. Frye's theory was medically plausible, particularly given contemporary scientific literature documenting associations between vaccination, fever, and subsequent neurodegeneration in children with mitochondrial dysfunction. *Id.* at 473.

On remand, the Special Master again denied the claim. *Paluck v. Sec'y of Health & Hum. Servs.*, No. 07-889V, 2013 WL 2453747 (Fed. Cl. Spec. Mstr. May 10, 2013), *vacated*, 113 Fed. Cl. 210 (2013), *aff'd*, 786 Fed.3d 1373 (Fed. Cir. 2015). This court again reversed, and the Federal Circuit affirmed. *Paluck v. Sec'y of Health & Hum. Servs.*, 113 Fed. Cl. 210 (2013), *aff'd*, 786 Fed.3d 1373 (Fed. Cir. 2015). The Special Master "misapprehend[ed Dr. Frye's] theory of causation" and applied an unreasonably rigid timeline for symptom onset. *Paluck*, 786 Fed.3d at 1380.[13] The Palucks had satisfied their statutory burden. *Id.* at 1385–86.

### D.    Petitioner's Medical Malpractice Suit

Finally, the Petitioner sued Yates's pediatrician (the one who administered the vaccines), alleging medical malpractice and lack of informed consent. ECF No. 118 at 26. The jury found in the doctor's favor on both and did not reach causation. *Hazlehurst v. Hays*, No. C-19-38 (Tenn. Madison Cnty. Cir. Ct. Mar. 11, 2022). Dr. Zimmerman was deposed in 2016 during the litigation. *See* ECF No. 120-6 at 9–11. That led to additional information and actions by the Petitioner, starting with a letter to DOJ.

### E.    OPR Investigation

The Petitioner also raised his allegations directly to the DOJ before coming to court. In September 2018, the Petitioner, along with Children's Health Defense, sent a letter to the Inspector General of DOJ. ECF No. 123-2 at 1–26. The letter alleged fraud on the court by DOJ attorneys in the autism cases. *Id.* at 26. DOJ referred the matter to the Office of Professional Responsibility ("OPR"). *See* ECF No. 123-3 at 1. OPR determined after a thorough investigation that no fraud occurred. *Id.* at 1–25.

The court gives little weight to OPR's investigation, though the Government urges it do so. The court sometimes cites to it below.

### F.    Procedural History

From October 15, 2007, to October 18, 2007, Special Master Campbell-Smith presided over a causation hearing in *Hazlehurst*. She denied compensation in February 2009. This court affirmed her decision in July 2009, and the Federal Circuit affirmed in May 2010.

---

[13] The Palucks offered the *Poling* paper in support of their claim. *Paluck*, 786 Fed.3d at 1379.

As relevant here, the Petitioner says the Tennessee state court litigation revealed important evidence. He says he now has discovered evidence of fraud on the court "during the OAP, the motion for review, and the appeal, which directly tainted the Supreme Court decision in *Bruesewitz.*" ECF No. 118 at 8. He says "[o]nly very recently was [he] able to obtain the necessary evidence to overcome DOJ's previous objections to the admissibility of critical material evidence necessary to prevail" on his claim.[14] *Id.*

The Petitioner moves the court to reopen the case under Rule 60(d)(3), set aside the judgment entered against the Petitioner based on fraud upon the court, and either (1) award compensation, (2) declare the National Childhood Vaccine Injury Act unconstitutional, (3) set aside the OAP, or (4) grant the Petitioner the right to discovery and an evidentiary hearing. *Id.* at 1.

## II.    Standard of Review

Rule 60 of the Rules of the United States Court of Federal Claims ("RCFC") governs here. *See* RCFC 60; *see also* Vaccine Rule 36(a) (instructing parties who file motions for relief under RCFC 60). That rule provides two avenues to raise fraud claims after final judgment.

RCFC 60(b) allows the court to issue relief for, among other reasons, "fraud[], misrepresentation, or misconduct by an opposing party." RCFC 60(b)(3). But such motions can only be brought within one year after the entry of judgment. RCFC 60(c)(1). The Federal Circuit affirmed *Hazlehurst* in 2010—more than fifteen years ago. *Hazlehurst*, 604 F.3d at 1345. So Rule 60(b)(3) cannot help the Petitioner challenge that judgment through a motion filed in 2024.

Rule 60(d), on the other hand, might. The rule allows a court to "set aside a judgment for fraud on the court." RCFC 60(d)(3). Unlike Rule 60(b)(3), a Rule 60(d)(3) motion can be brought at any time; there is no explicit deadline. That Rule 60(d) motions are not time-barred means courts must define "fraud on the court" narrowly "lest [this nebulous concept] become an open sesame to collateral attacks" not subject to Rule 60(b) reconsideration. *In re Golf 255, Inc.*, 652 F.3d 806, 809 (7th Cir. 2011) (quoting *Oxxford Clothes XX, Inc. v. Expeditors Int'l of Washington, Inc.*, 127 F.3d 574, 578 (7th Cir. 1997)); *Broyhill Furniture Indus., Inc. v. Craftmaster Furniture Corp.*, 12 F.3d 1080, 1085 (Fed. Cir. 1993) (quoting *Great Coastal Express, Inc. v. Int'l Brotherhood of Teamsters*, 675 F.2d 1349, 1356 (4th Cir. 1982)).[15]

---

[14] He says that Dr. Zimmerman "first volunteered that the DOJ did not call him as a witness in the OAP after he told the DOJ that vaccines did cause autism." ECF No. 118 at 26. That revelation "illuminated existing evidence and led to additional relevant information about DOJ fraud and the cause of Yates'[s] neurological injuries." *Id.* Accordingly, the Petitioner entered various affidavits that he says make Dr. Zimmerman's supplemental *Poling* paper admissible. *Id.* at 26–27. These affidavits do not change the court's conclusion that no fraud on the court occurred.

[15] Because the text of RCFC 60(d) and Rule 60(d) of the Federal Rules of Civil Procedure ("FRCP") are materially the same, this court applies precedent interpreting FRCP 60(d) as well.

Fraud on the court is therefore reserved solely for deliberate, egregious conduct that fundamentally corrupts the judicial process itself. *United States v. Sierra Pac. Indus., Inc.*, 862 F.3d 1157, 1169 (9th Cir. 2017); *Broyhill Furniture*, 12 F.3d at 1085–86 (explaining that fraud on the court is "typically confined to the most egregious cases, . . . such as bribery of a judge or juror, or improper influence exerted on the court by an attorney, in which the integrity of the court and its ability to function impartially is directly impinged"); *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 244–45 (1944); *Aoude v. Mobil Oil Corp.* (*Aoude II*), 892 F.2d 1115, 1118 (1st Cir. 1989). It occurs when a party clearly and convincingly demonstrates that the other "has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Aoude II*, 892 F.2d at 1118; *Broyhill Furniture*, 12 F.3d at 1085 (explaining that fraud on the court means "a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases").

Among the seminal cases on fraud on the court is *Hazel-Atlas*. That case began when Hartford applied for a glass manufacturing patent. *Hazel-Atlas*, 322 U.S. at 240. The Patent Office, however, was hostile and its opposition to Hartford near "insurmountable." *Id.* Eventually, though, the Patent Office granted the patent. *Id.* at 241. Some time later, Hartford sued Hazel-Atlas for patent infringement. *Id.* Although the district court determined that no infringement occurred, the circuit court held there was infringement, relying heavily on an expert article Hartford submitted during the application process that lauded the subject of Hartford's possible patent. *Id.* at 241–42. A few years later, Hazel-Atlas learned that a "Hartford lawyer was the true author of the spurious publication." *Id.* at 241. This was not known because the lawyer had attributed the article to an "ostensibly disinterested expert." *Id.* at 240. The Supreme Court found fraud on the court because there was a "deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals," too. *Id.* at 245.

Another "near-classic example" is *Aoude*. Aoude rented a service station from Mobil Oil Corporation and operated it for several years. *Aoude v. Mobil Oil Corp.* (*Aoude I*), 862 F.2d 890, 891 (1st Cir. 1988). He then sought to acquire another Mobil franchise from an operator, John Monahan, and needed Mobil to approve the acquisition. *Id.* at 891–92. When Mobil was not inclined to approve of the acquisition, Aoude sued to compel Mobil to approve the acquisition. And to gain leverage with Mobil, Aoude "concocted, backdated, and persuaded Monahan to sign, a bogus purchase agreement." *Aoude II*, 892 F.2d at 1116. He then attached the purchase agreement to his complaint that sought to force Mobil to accept the agreement. *Id.* at 1116–17. All the while, "Aoude and his counsel continued to act out the charade." *Id.* at 1118. This was "brazen" conduct, and a fraud on the court. *Id.* at 1122.

Of course, not every instance of misconduct satisfies this stringent standard. In fact, most fall short. Perjury, nondisclosure, or even fabricated evidence—though unquestionably

---

*Kraft, Inc. v. United States*, 85 F.3d 602, 605 n.6 (Fed. Cir. 1996) ("[P]recedent interpreting the Federal Rules of Civil Procedure applies with equal force to the comparable Rules of the Court of Federal Claims." (citation omitted)), *opinion modified on other grounds on denial of reh'g*, 96 F.3d 1428 (Fed. Cir. 1996).

wrongful—are normally viewed as a garden-variety fraud, addressable through standard adversarial processes and/or a Rule 60(b)(3) motion, not a Rule 60(d)(3) motion. *See Weese v. Schukman*, 98 F.3d 542 (10th Cir. 1996); *Fox v. Elk Run Coal Co.*, 739 F.3d 131, 137–38 (4th Cir. 2014); *Great Coastal Express*, 675 F.2d at 1356–57.

Importantly, "the fraud, misrepresentation[,] or conduct must have actually deceived the court. If a court's judgment was not influenced by the conduct at issue, the judgment should not be set aside." *Dobyns v. United States*, 127 Fed. Cl. 63, 69 (2016) (quoting *In re Old Carco LLC*, 423 B.R. 40, 52 (Bankr. S.D.N.Y. 2010)), *aff'd*, 915 F.3d 733 (Fed. Cir. 2019). "[T]he relevant misrepresentations must go 'to the central issue in the case,'" "affect the outcome of the case," and "significantly change the picture already drawn by the previously available evidence." *Sierra Pac.*, 862 F.3d at 1168 (quoting *United States v. Estate of Stonehill*, 660 F.3d 415, 435, 448, 952 (9th Cir. 2011); *Baltia Air Lines, Inc. v. Transaction Mgmt., Inc.*, 98 F.3d 640, 642–43 (D.C. Cir. 1996) (explaining how the alleged fraud must factor into the court's decision). Finally, the court must appreciate the finality of judgments. *See Hazel-Atlas*, 322 U.S. at 244 (explaining "[o]ut of deference to the deep[-]rooted policy in favor of the repose of judgments . . . , courts[] have been cautious" when analyzing fraud on the court claims). All doubts are to be resolved in favor of the prior judgment.

For example, no fraud on the court occurred when counsel in *United States v. Shaffer Equip. Co.* concealed a witness's falsified credentials. 11 F.3d 450, 452 (4th Cir. 1993). This did not amount to fraud on the court because the misconduct did not irreparably compromise the proceedings. *Id.* at 453. Nor did a fraud on the court occur when counsel did not disclose allegedly longstanding knowledge about asbestos dangers, undermining a defense at trial. *Wilson v. Johns-Manville Sales Corp.*, 873 F.2d 869, 872 (5th Cir. 1989). That is because nondisclosure does not directly corrupt judicial proceedings—even if the conduct is "most egregious and disturbing." *Shaffer Equipment Co.*, 11 F.3d at 452.

And in *Great Coastal Express*, the Fourth Circuit rejected a fraud on the court claim even though the plaintiff planned and executed much of the violence underlying the lawsuit, presented false testimony, and fabricated evidence. 675 F.2d at 1358. After all, "[p]erjury and fabricated evidence are evils that can and should be exposed at trial, and the legal system encourages and expects litigants to root them out as early as possible." *Id.* at 1357.

Finally, consider *Fox*, a case about a coal miner's widow seeking benefits under the Black Lung Benefits Act where Elk Run's law firm withheld certain pathology reports and failed to disclose all relevant medical evidence to its own expert, resulting in an incomplete picture of the plaintiff's health, which was at issue during the litigation. 739 F.3d at 136–37. While the conduct of the attorneys was "hardly admirable," it "did not . . . demonstrate the commission of" fraud on the court. *Id.* at 133. Concealment was not part of an intentional design to undermine the integrity of the adjudicative process, but akin to a hardball (if unethical) tactic in the adversarial process. *Id.* In short, the suppression of those expert reports, though deceptive, amounted to "garden-variety" fraud or discovery misconduct. *Id.* at 135–36; *see also Dobyns*, 127 Fed. Cl. at 74 (finding allegations of witness threats and improper attorney influence on witnesses insufficient for fraud on the court without proof of outcome alteration); *SEC v. ESM Grp., Inc.*, 835 F.2d 270, 273–74 (11th Cir. 1988) (finding allegations that amount to a failure to disclose information that would have helped an opposing party's defense insufficient for fraud

on the court because it "[a]t best" went to witness credibility, not to any miscarriage of justice); *Gleason v. Jandrucko*, 860 F.2d 556, 557 (2d Cir. 1988) (explaining that "subsequently discovered evidence of perjury by a witness and nondisclosure does not support a finding of 'fraud on the court'").

In sum, misrepresented or suppressed evidence usually does not amount to a fraud on the court. When it does, the misconduct must so defile the judicial process that it calls into question the legitimacy of the court's decision itself, meaning that the alleged misconduct must have fundamentally altered the outcome or impaired the affected party's ability to fairly present its case.

## III.    Discussion

The Petitioner argues DOJ committed fraud on the court when it failed to withdraw Dr. Zimmerman's written expert report in *Cedillo* even though he had clarified that he believed vaccines could cause autism. ECF No. 118 at 1–3. That failure to withdraw, the Petitioner argues, led to fraud on the Special Masters during the OAP, on this court, on the Court of Appeals for the Federal Circuit, and ultimately, on the Supreme Court. *Id.* He also argues fraud occurred regarding the resolution of the *Poling* case—whether it was as a Table injury or an Off-Table injury. *Id.* at 6. Finally, he contends that the Vaccine Injury Compensation Program is unconstitutional. The court disagrees on all counts.

### A.    Nothing the Petitioner alleges here establishes fraud on the court.

#### 1.    DOJ did not commit fraud on the OSM during the OAP.

The Petitioner argues the Government committed fraud on the court during the OAP process in two ways. First, that DOJ improperly kept Dr. Zimmerman's written opinion in the record, concealing his true opinion. *Id.* at 8–14. Second, he argues that DOJ suppressed and misrepresented the *Poling* concession. *Id.* at 14–19. Neither establishes fraud on the court.

##### a)    *DOJ did not conceal Dr. Zimmerman's "true" opinion.*

Recall that, in *Cedillo*,[16] DOJ submitted an expert report that Dr. Zimmerman prepared. ECF No. 120-3. In his report, Dr. Zimmerman concluded that there was no basis for a link between the MMR vaccine and autism. *Id.* at 5. Recall too that DOJ initially planned to call him to testify during the *Cedillo* hearing. ECF No. 131 at 8. But it decided not to. ECF No. 120-6 at 7. The Parties disagree as to why. Dr. Zimmerman believes that DOJ did not call him to testify because of his discussion with DOJ attorneys in which he stated his view that vaccines might cause autism in children with underlying mitochondrial dysfunction, and that he wanted his opinion about the link between MMR and autism to apply only to Michelle Cedillo's case, not as a "blanket statement." *See id.* The Government says it did not call Dr. Zimmerman because his

---

[16] The *Cedillo* evidence is pertinent here because under the OAP, the evidence entered in each test case would be considered in all the test cases.

testimony was unnecessary.  ECF No. 123-3 at 9.  But the Government left Dr. Zimmerman's written report in the record, and later quoted from it in the closing argument in *Hazlehurst*.

The Petitioner argues that DOJ committed a fraud on the court by using "Dr. Zimmerman's written *Cedillo*-specific causation opinion as general causation evidence[,] explicitly claiming that it was Dr. Zimmerman's general causation opinion[—]in other test cases, including [*Hazlehurst*], when the DOJ knew that this was not true."  ECF No. 132 at 2–3; *see* ECF No. 118 at 31–32 (arguing that a fraud on the occurred in part because DOJ "quoted as general causation evidence the exact language from Dr. Zimmerman's opinion that Dr. Zimmerman had clarified directly to [DOJ] as specific to the *Cedillo* case, and was not general causation evidence"); ECF No. 123-2 at 6 (arguing that by hiding Dr. Zimmerman's opinion, "HHS and its attorneys . . . actively conspir[ed] and schem[ed] to prevent brain injured children from obtaining their lawful remedies").  The argument rests on an alleged failure to disclose.  On the Petitioner's reading of the relevant jurisprudence, a fraud on the court occurs "[w]hen a lawyer fails to disclose material evidence or fails to correct a false statement of material fact or law previously made when that particular evidence is key to determining the case's outcome."  ECF No. 118 at 29–30 (citing *Hanover Ins. Co. v. United States*, 146 Fed. Cl. 447 (2019)).

These arguments fail for several reasons.  First, when he spoke with the DOJ attorneys during the break in the *Cedillo* hearing, Dr. Zimmerman's concerns about the scope of his opinion involved his work on the *Poling* paper.  The *Poling* paper, however, was already in the trial record, listed on Dr. Zimmerman's CV (also in the record), and was publicly available more than one year before the hearing.  ECF No. 120-2 at 8.  The DOJ attorneys were clearly aware of Dr. Zimmerman's opinion that a vaccine caused Hannah Poling's autism long before the *Cedillo* hearing and intended to call him to testify anyway.  And there is nothing in the record or in the Petitioner's argument to suggest that DOJ did anything to hide the *Poling* paper from anyone—it was in the trial record after all.

Second, the *Poling* paper concerned the mitochondrial dysfunction theory, which was not at issue in any of the test cases and "irrelevant to [P]etitioner's case."  ECF No. 131 at 29.  The theory of causation at issue in *Cedillo* was whether the MMR vaccine and TCVs, acting together, can cause autism.  More importantly, as the Government points out, Dr. Zimmerman authored his *Cedillo* report more than one year *after* he co-authored the *Poling* paper.  *Id.*  So, "he must have found no conflict between the suggestion in the [Poling] case note that there might be a link between immunizations and autism in children with mitochondrial disorders" and the connection between MMR vaccines and autism. ECF No. 123-3 at 6.  As there were different issues being tested, DOJ "did not use Dr. Zimmerman's *Cedillo* opinion improperly in other cases."  ECF No. 131 at 24.  And Dr. Zimmerman "never asked [DOJ] not to use his opinion in other OAP cases."  *Id.* (emphasis omitted).

This conclusion is bolstered by Dr. Zimmerman's recognition that DOJ attorneys told him that his *Cedillo* opinion would be used as general causation evidence in other Theory 1 cases and by the fact that the PSC "never asked any witness about" the mitochondrial dysfunction theory, nor did any of its witnesses offer the theory.  ECF No. 131 at 10; ECF No. 123-3 at 22.  And Yates was not diagnosed with an underlying mitochondrial dysfunction until several years after *Hazlehurst* concluded, so the court struggles to see how the mitochondrial dysfunction theory could have impacted the decision.  *See* ECF No. 123-7 at 4–5.

Third, DOJ did not attempt to conceal Dr. Zimmerman's opinion in any other case. He presented his mitochondrial dysfunction theory in several other cases: *Murphy*, *Madariaga*, and *Reed*, to name a few. *See supra* at 16. In each case, the Special Master rejected the mitochondrial dysfunction theory that Dr. Zimmerman presented in each case. This is important for two reasons. First, it shows that the Government did nothing to prevent Dr. Zimmerman from presenting his mitochondrial dysfunction theory. Second, it shows that when he did present his theory the Special Masters found it unpersuasive, which supports the conclusion that it would not have changed the outcome here. *Sierra Pac.*, 862 F.3d at 1168 (explaining that a fraud on the court claim cannot survive if it does not affect the outcome of the case). True, *Paluck* stands to the contrary. But one case among many, involving a theory not at issue in the OAP, does not persuade the court to the contrary given the significant burden that the Petitioner must overcome to establish fraud on the court.

Fourth, Dr. Zimmerman's expert report played almost no role in either *Cedillo* or *Hazlehurst.* Special Master Hastings in *Cedillo* cited Dr. Zimmerman once; Special Master Campbell-Smith in *Hazlehurst* cited him twice. And each explicitly stated that they gave more weight to the testifying experts. To be sure, Special Master Vowell in *Snyder* did cite to Dr. Zimmerman several times, but mostly to explain the varying views of the evidence. So, even if Dr. Zimmerman did testify, his testimony would not likely have changed Special Master Hastings's decision. Again, the Petitioner's burden requires much more.

The Petitioner disagrees. He argues Dr. Zimmerman's testimony "would have changed the outcome of the OAP test cases" because the "Special Masters clearly relied upon the DOJ's fraudulent misrepresentations concerning Dr. Zimmerman's opinion." ECF No. 132 at 16. Not only that, but Dr. Zimmerman "was unquestionably [DOJ's] most qualified expert on the subject of autism." *Id.* at 17. He also says DOJ's withdrawal was prejudicial, "demonstrating the importance of Dr. Zimmerman's opinions," because it contributed to Special Master Campbell-Smith's decision to not "decide whether there was such a thing as regressive autism." *Id.* The non-withdrawal of the expert report coupled with DOJ's statements during closing argument regarding Dr. Zimmerman's opinion magnified the fraud on the court, the Petitioner says. ECF No. 118 at 32. Specifically, he says DOJ intentionally misled OSM about the expert opinion, and it was relied on because "the Special Master cited the exact same portion of Dr. Zimmerman's expert opinion that [DOJ] quoted in closing." *Id.* Finally, the Petitioner points to the OPR response, where it concluded that DOJ "kept his report in the record, figuring that if the report were withdrawn, it would suggest that Dr. Zimmerman was not called because he had changed his opinion." *Id.* at 30. That admission "is evidence of DOJ's intent to defraud the [c]ourt." *Id.*

But one look at the decisions at the OAP dispels any materiality concern, so even if DOJ could be faulted for failing to disclose Dr. Zimmerman's theory, it was not material. Indeed, this case is like the many unsuccessful fraud on the court claims based on such failure. Take *Fox*, for example, where a coal company's law firm withheld certain pathology reports and failed to disclose all relevant medical evidence. But there was no fraud on the court because it was not part of an intentional design to undermine the court's integrity. *Fox*, 739 F.3d at 137–39. Similarly, in *Wilson* the plaintiff alleged that the defendants concealed asbestos dangers but there was no fraud on the court because it was merely nondisclosure. 873 F.2d at 872. And in *ESM Group*, counsel failed to disclose important jurisdictional information, but no fraud on the court

occurred because the information merely would have been helpful in the opposing party's defense, and, at best, went to witness credibility.  835 F.2d at 273–74.

Those results aid in the court's decision here.  At most, the failure to withdraw Dr. Zimmerman's expert report is a failure to disclose his caveat that his opinion was case-specific. A failure to disclose, without more, is not fraud on the court.  Instead, it is "garden-variety" matter meant to be addressed either during the proceeding or under Rule 60(b) within one year of the judgment.  *See* RCFC 60(b)–(c) (explaining that a motion for relief from a final judgment based on mistake, newly discovered evidence that could not have been earlier discovered, or fraud must be brought within one year).  Or it is a "tactical litigation decision" that is not an issue under Rule 60 at all.  Litigants may decide which witnesses to present; choosing not to put an expert on the stand is a common one.

In any event, the PSC had the *Poling* paper in the OAP record and could have questioned witnesses about it if the PSC thought it was relevant.  This underscores the absence of intentional deception or concealment.  Such a peripheral piece of evidence, raised but not pursued, had no apparent impact on the outcome or on the court's ability to adjudicate impartially.  In sum, the key hallmarks of fraud on the court are absent: there was no intentional deception of the Special Masters or any of the judges hearing these cases, no scheme to interfere with the judicial machinery, and no material falsehood affecting the proceeding.  Rather, this involved ordinary trial tactic and a minor evidentiary discrepancy that was ultimately moot.  *See Cleveland Demolition Co. v. Azcon Scrap Corp.*, 827 F.2d 984, 985–86 (4th Cir. 1987) (explaining that strategic litigation decisions are not fraud on the court ); *Fox*, 739 F.3d at 137 ("Conduct that is not exemplary need not undermine the 'integrity of the court and its ability to function impartially' within the meaning of 'fraud on the court.'" (quoting *Great Coastal Express*, 675 F.2d at 1356)).

To be sure, quoting from Dr. Zimmerman's expert report after choosing not to call him to testify may not be the way all lawyers would have handled the OAP litigation, but the court disagrees with the Petitioner that it "had wide-ranging implications to all OAP cases."  ECF No. 118 at 10 (emphasis omitted).  This does not rise to fraud on the court.

The Petitioner relies on *Hazel-Atlas* for several "principles."  He says the *Hazel-Atlas* recognized that "(1) every court has the inherent power to vacate a judgment obtained by fraud on the court; (2) the court that was the victim of the fraud should consider the matter; and (3) there is no time limit on setting aside a judgment on this ground."  ECF No. 118 at 27–28 (citing *Hazel-Atlas*, 322 U.S. at 238).  The court agrees with these points.  The Petitioner also notes that "[o]ne of the primary reasons justifying relief under the fraud on the court doctrine . . . is 'an injury to more than a single litigant that assaults the integrity of the judicial process.'"  *Id.* at 34 (citing *Hazel-Atlas*, 322 U.S. at 246).  The court likewise agrees with that point.  But the court does not agree that "the facts of [*Hazlehurst*] are similar to" *Hazel-Atlas*, ECF No. 132 at 18–19, because no fraud on the court occurred here.  In *Hazel-Atlas*, lawyers authored a fake article that purported to be from a neutral expert in support of a patent, and that article was relied on tremendously, "for the deliberate purpose of deceiving the Patent Office" into awarding them a patent.  322 U.S. at 250.  No similar activity or malfeasance occurred here.  DOJ made a litigation decision that, even if faulted, was not material to the OAP or subsequent court decisions.

In the end, this was not fraud on the court.  The alleged fraud, was not "the most egregious conduct" that "prevented the functioning of the judicial process."  Nor was there any misconduct that prevented the PSC from fairly presenting its case, and the court was not materially misled.

> b)    *DOJ and HHS did not secretly concede* Poling *to prevent it from becoming a test case, nor did it improperly suppress the Rule 4 report.*

The Petitioner next argues that "DOJ and HHS secretly conceded the *Poling* case to prevent it from becoming a test case, because the HHS expert would have revealed evidence of how vaccines cause autism."  ECF No. 118 at 6.  He likewise argues that DOJ and HHS improperly suppressed Dr. Zimmerman's expert report (submitted in support of the argument that seizures were a product of vaccines) and changed the basis of compensation "to conceal fraud and critical material evidence of how vaccines cause autism."  *Id.* at 18.

First, it is clear DOJ conceded *Poling* as a Table injury, undermining many of the Petitioner's claims.  *Poling* "was compensated on the presumption of causation that attaches when the Table injury requirements are met, not on actual causation or causation in fact basis."  *R.K.*, 2015 WL 10911950, at *17 (emphasis omitted).  The Rule 4 reports refer to an injury appearing on the Table.  That reference would be "nonsensical, as the only injuries that appear on the Table are those for which entitlement to compensation is presumed, such as the MMR Table injury of encephalopathy."  *Id.*  Thus, the argument that the statements made by Special Master Campbell-Smith regarding the grounds on which the case was conceded as "inconsistent with both the original and Supplemental" Rule 4 reports is rejected.  ECF No. 118 at 19.

Second, Dr. Zimmerman's expert report in *Poling* did not impact the government's initial concession in that case nor the decision in *Hazlehurst*.  Dr. Zimmerman's *Poling* expert report "was filed after the case was conceded in the Rule 4 report, [so] it could not possibly have been a factor in respondent's decision to concede entitlement to compensation on the basis of a Table injury."  *See R.K.*, 2015 WL 10911950, at *22 (finding that "the Zimmerman report was not what prompted the respondent to concede the *Poling* case").  And different theories of causation were considered in each: in *Hazlehurst*, whether a combination of the MMR vaccine and TCVs could cause autism; in *Poling*, whether vaccines could aggravate an underlying mitochondrial condition, leading to regressive autism.  So the concession could not have played any role in *Hazlehurst*.

Third, the report by Dr. Zimmerman suggests that vaccines significantly aggravated a mitochondrial disorder, resulting in regressive autism.  That opinion was not suppressed at any point for the reasons described above, and it is one that has been consistently rejected.  So the argument that DOJ concealed "Dr. Zimmerman's . . . opinion[] explaining how vaccines cause autism in some children" cannot survive.  ECF No. 118 at 15.  Dr. Zimmerman also "was unaware of any effort by any Department attorney to suppress his opinion in *Poling*, and that no

one from the government had ever asked him not to share or discuss it with anyone else."[17]  ECF No. 123-3 at 14.

Finally, even assuming everything the Petitioner argues regarding the Rule 4 reports is true, he would still fail to establish fraud on the court.  Special Master Campbell-Smith saw everything: the initial Rule 4 report, the supplemental Rule 4 report, and the supplemental memorandum.  She concluded that the *Poling* concession was for a Table injury.  The merits of her conclusion are not the issue before this court; the question is whether there was fraud on the court about whether the Government settled the *Poling* case as a Table or Off-Table injury.  Given the Special Master's full awareness of everything in each of the three documents when she made her decision, any change the Government may have made in those documents cannot have constituted a fraud on the court.  *See Dobyns*, 127 Fed. Cl. at 69 (citations omitted) (explaining that the fraud "must have actually deceived the court").

<h3 align="center">2.    DOJ did not commit fraud on this court.</h3>

The Petitioner also argues that DOJ committed fraud on this court when the PSC moved for review in *Hazlehurst*.  ECF No. 118 at 19–20.  The petition asserted, among other arguments, that the Special Master improperly declined to decide whether regressive autism is distinct from classic autism.  *Hazlehurst*, 88 Fed. Cl. at 478.  The Special Master did not decide whether a distinction existed because that distinction rested on two predicates that the PSC failed to prove, so it was unnecessary.  *See Hazlehurst*, 2009 WL 332306, at *24 (explaining that she need not reach the distinction issue because she was "[u]npersuaded that childhood vaccines lead to the development of autism").  The several studies on which the PSC's main expert relied upon for the distinction were "widely discredited by the scientific community," and "the testing conducted" at the labs "contained procedural flaws that compromised their reliability."  *Hazlehurst*, 88 Fed. Cl. at 478.  So, the expert's opinion "could not be credited as sound or reliable," meaning the PSC's causation theory was "premised upon a series of biological implausibilities."  *Hazlehurst*, 2009 WL 332306, at *13, *149.  During oral argument, DOJ argued that the Petitioner was "basically assigning error to the Special Master by saying that she failed first to consider whether regressive autism is causally distinct from classic autism is their word.  But the fallacy in that argument is that they didn't give her any evidence that there is a distinct cause."  ECF No. 122-3 at 14:11–16.  This court denied the petition for review.  *Hazlehurst*, 88 Fed. Cl. at 475.

The Petitioner makes a few arguments that this court's prior decision was polluted by fraud, largely premised on the "fraud" that led to a favorable decision for DOJ in the *Cedillo* and *Hazlehurst* OAP hearings.  First, the Petitioner argues that in denying the prior petition, the court "did not and could not have known or considered that Dr. Zimmerman had materially modified his general causation opinion or that the DOJ had perpetrated fraud."  ECF No. 118 at 20.  He

---

[17] While the Petitioner argues that the Special Masters "knew or should have known" that Dr. Zimmerman's written expert opinions "completely conflict," ECF No. 118 at 35, the argument carries little weight.  Dr. Zimmerman's opinions present different causation theories that he did not believe "completely conflict."  He authored his expert report in *Cedillo* one year after the publication of the *Poling* paper.  ECF No. 120-2 at 8.  Nor has he ever rescinded in full his *Cedillo* opinion.  Thus, he did not think that his two opinions "completely conflict."

repeats the argument that fraud occurred, as DOJ attorneys "were well aware of Dr. Zimmerman's revised opinion that vaccines can cause regressive autism and participated in DOJ's fraudulent scheme to conceal and misrepresent his opinion." *Id.* This argument fails because no fraud occurred regarding Dr. Zimmerman, for the reasons described above.

Second, the Petitioner argues that fraud on the court occurred because "DOJ attorneys knew their arguments to [the Court of Federal Claims] were deceptive because they signed the original *Poling* Rule 4(c) Report and subsequently received Dr. Zimmerman's supplemental expert opinion dated November 30, 2007, before executing the Supplemental *Poling* Rule 4(c) Report on February 21, 2008." *Id.* at 33. But, as explained above, the Government conceded *Poling* as a Table injury, meaning no causation determination was made because causation is presumed in Table injury cases.

Third, the Petitioner argues that the court's faulting him for the failure to provide evidence regarding whether there are distinct causes for classic and regressive autism was the result of fraud. He contends that what DOJ "failed to acknowledge, however, was that the DOJ hid this very evidence from [the Petitioner] and the Special Master." *Id.* at 20 n.62. This argument fails because DOJ did not hide any evidence, and no wrongdoing occurred with Dr. Zimmerman's opinion. Again, the *Poling* paper addressing Dr. Zimmerman's mitochondrial dysfunction theory was in the record long before *Hazlehurst* began.

In the end, the conduct before this court, even if the court could construe it as improper, falls well short of "the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party" that is required to establish a fraud on the court. *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1338 (5th Cir. 1978) (quoting *United States v. Int'l Tel. & Tel. Corp.*, 349 F. Supp. 22, 29 (D. Conn. 1972)).

### 3.    DOJ did not commit fraud on the Court of Appeals for the Federal Circuit.

The Petitioner next argues that DOJ committed fraud on the Federal Circuit during oral argument in *Hazlehurst*. The panel asked the DOJ attorney about developing science and medicine regarding whether vaccines can cause autism. ECF No. 122-6 at 3–4. She responded, "at this stage, [] we're not even at the stage where it's medically or scientifically possible." *Id.* OPR interviewed that lawyer, and explained, "[i]n retrospect, she regarded her response as slightly inaccurate, 'not because of anything to do with Dr. Zimmerman, [or] the *Poling* case,' but rather because she now 'appreciate[s] that science does not work in absolutes. Anything is "possible" in science.'" ECF No. 123-3 at 18. OPR found the comment to be a "mistake" not meant to mislead the court, but "made in the tense and unrehearsed atmosphere of an appellate oral argument, without time to carefully prepare" remarks. *Id.* at 24.

These answers amounted to fraud on the court, the Petitioner says, because they were "exceptional and provably false statements of material fact." ECF No. 118 at 33. Not only that, the lawyer "knew that her statements . . . were [false] because she had signed the *Poling* Rule 4(c) Report conceding vaccine injury caused regressive autism in *Poling*, which is primarily based on Dr. Zimmerman's expert opinion." *Id.* These "intentional false statements to the Court of Appeals were part of a larger plan and scheme to conceal the truth as to the central issue of the OAP[.] . . . [Her] false statements were made with the intent to deceive the court and to affect

26

the outcome." *Id.* at 34 (internal footnote omitted). And "[i]f the DOJ is allowed to perpetrate such a boldfaced lie to the Court of Appeals regarding the central issue of the OAP, then it completely undermines the integrity of the courts and the entire American legal system." *Id.* These conclusory statements do not turn these statements into a fraud on the court. But again, nothing involving Dr. Zimmerman amounted to fraud on the court. And the same is true of the *Poling* concession.

Materiality is also a necessity, so the court turns to the Federal Circuit's decision in *Hazlehurst* to analyze the issues it decided and why. On appeal in *Hazlehurst*, the Petitioner argued "that the special master improperly relied on certain evidence that should have been excluded and disregarded other evidence that should have been considered."[18] *Hazlehurst*, 604 F.3d at 1345. "[T]he linchpin of their theory was the discovery of persistent measles virus in certain autistic children who had received the MMR vaccine." *Id.* at 1346. That evidence derived from research that has been heavily discredited.[19] *Id.* at 1347. This court rejected the argument, and the Federal Circuit followed the same path: Special Master Campbell-Smith complied with her statutory directive to conduct a fair proceeding. *Id.* at 1349. Furthermore, neither this court nor the Federal Circuit mentioned Dr. Zimmerman's expert report. And, of course, neither address mitochondrial dysfunction. Nor did either note the DOJ lawyer's statement about "[not even being] at the stage where it's medically or scientifically possible" for vaccines to cause autism. Given this lack of reliance, no fraud on the court occurred. There simply is no basis to conclude that the conduct at the Federal Circuit rises to the level of fraud on the court.

<div align="center">

4.    <u>DOJ did not commit fraud on the Supreme Court of the United States.</u>

</div>

In *Bruesewitz*, the Supreme Court held that the Vaccine Act expressly preempts design defect claims. So long as vaccines are accompanied by proper directions and warnings, vaccine manufacturers are not liable for vaccine-induced injury or death. *Bruesewitz*, 562 U.S. at 231–34. In other words, the Vaccine Act's provisions still govern.

The Petitioner argues that the decision was procured by fraud. His argument goes like this: (1) Because DOJ concealed Dr. Zimmerman's mitochondrial dysfunction theory at the

---

[18] As for the evidence that "should have been excluded," the OSM gave the PSC an extra year to rebut it, but the PSC chose not to. *Hazlehurst*, 604 F.3d at 1347. As for the evidence that "should have been considered," the OSM gave it appropriate weight. *See id.* at 1352 (explaining that the Special Master "accord[ed] little weight" to the evidence because of the study's severe and several shortcomings). Importantly, it would have made no difference in the Federal Circuit's decision.

[19] The researchers' behavior was concerning. They "tested degraded genetic material rather than discarding it" and "used inconsistent procedures to extract and evaluate the genetic material." *Hazlehurst*, 604 F.3d at 1348. They "omitted key steps necessary to prepare samples" and "failed to heed the equipment manufacturer's instruction[s]." *Id.* They also "reported positive findings, rather than re-running tests, when duplicate assays showed inconsistent results." *Id.* Testimony also suggested contamination. *Id.*

OAP, the PSC lost; (2) The respondent in *Bruesewitz* made policy arguments that allowing vaccine manufacturer liability for design defects could lead to a flood of financially-crushing litigation and cited the OAP as an example of such potential; (3) The majority relied on the policy argument for its ruling, so if the PSC succeeded at the OAP, the Supreme Court would have ruled otherwise. *See* ECF No. 118 at 21–23; Brief for Respondent at 56–57, *Bruesewitz*, 562 U.S. 223 (2011) (No. 09-152), 2010 WL 2962899, at *56–57 (noting that, after the OAP concluded and found no link between the vaccines at issue and autism, a contrary result in *Bruesewitz* might "embolden[]" "claimants in the [OAP] . . . to pursue a flood of civil actions").

Justice Breyer concurred, focusing partially on some policy concerns that some amici posited (and cited to *Hazlehurst* and the OAP). *Bruesewitz*, 562 U.S. at 247–49 (Breyer, J., concurring). In dissent, Justice Sotomayor pointed to the policy arguments advanced by the respondent, and that that concern "underlie[s] the majority and concurring opinions." *Id.* at 274 n.25 (Sotomayor, J., dissenting). She did not seem worried about the policy implications, deeming them "remote."[20] *Id.*

The Petitioner's theory contains a series of inferential leaps that the court cannot make. To begin, the court has established that DOJ did not conceal Dr. Zimmerman's opinion on the mitochondrial dysfunction hypothesis, and the *Poling* paper was not material to the OAP decisions. Indeed, there is no basis for the court to conclude that the OAP's results would have changed had Dr. Zimmerman testified during *Cedillo*. Given his testimony failed to persuade Special Masters when he did present it, this court cannot conclude that "a single policy argument was dispositive of the holding in that case is 'wholly speculative and highly dubious.'" ECF No. 131 at 36 (quoting ECF No. 123-3 at 24–25). It falls well short of the high bar that the Petitioner must clear to establish fraud on the court.

5.     <u>DOJ is not continuing to perpetrate fraud on the court.</u>

The Petitioner also argues that DOJ continues to perpetrate fraud on the court. ECF No. 118 at 25–26; ECF No. 132 at 15–16 (arguing that DOJ is committing a fraud on the court still because it is "[a]ctively misrepresenting and making false statements to this [c]ourt regarding changing the basis of compensation in *Poling*"). For the same reasons described above regarding the purported misrepresentations to Special Master Campbell-Smith, this argument fails. She had all of the documentation in front of her and made an informed decision. That is not fraud.

**B.    Petitioner may not challenge the constitutionality of the Vaccine Act in a Rule 60(d) motion.**

Finally, the Petitioner argues that the Vaccine Act violates his right to due process and equal protection. ECF No. 118 at 38–39. On his understanding of the Act, Congress placed injured vaccinees "into a subclass of citizenship" by "nationaliz[ing] the vaccine program and forc[ing] the injured into an administrative program, depriving them of the most basic judicial processes, including the right to a judge, jury, the rules of civil procedure, discovery, and

---

[20] The Petitioner says Justice Sotomayor "particularly focused" on the OAP and policy arguments. ECF No. 118 at 22. That is not the case. She references the OAP in one footnote.

evidence." *Id.* at 39. If this were not the case, he says Dr. Zimmerman's opinion "would likely have been exposed if the ordinary rules of evidence and the ability to cross-examine witnesses had been available." *Id.* Finally, he says that "the restrictions of the Vaccine Act render the right to appeal to courts of law essentially meaningless in all but the rarest of cases." *Id.* The Petitioner cites no authority for his propositions.

But the Petitioner cannot use a motion alleging fraud on the court to challenge the constitutionality of the Vaccine Act nearly 16 years after judgment. Fraud on the court cases make clear that courts must appreciate the finality of judgments, *see Hazel-Atlas*, 322 U.S. at 244, and that fraud on the court is not meant to be used to revisit a statute's validity. The Petitioner had every opportunity to raise a constitutional challenge during the original proceedings, whether before this court or the Federal Circuit. Those avenues have long since closed. Judgments, once final, must remain final unless fraud on the court is proven. And here, no such fraud occurred. *See supra* at 21–29. Thus, the constitutionality claims must also be rejected.

Even if the Petitioner could raise his constitutional arguments, they would fail. As an initial matter, for the reasons described above, Dr. Zimmerman's opinion was not concealed, so there was nothing to "expose." Even so, the Petitioner's due process and equal protection arguments would fail for another reason—the Petitioner's premise that vaccine petitioners are relegated to some second-class status without due process or equal protection rights is without merit. The Act provides a low cost and often easier process to petitioners seeking to recover for vaccine injuries. *E.g.*, *Shalala*, 514 U.S. at 269. It did not bar the Petitioner from bringing his case to other courts.

Consider the text of the Act. Petitioners must first bring their claims to the OSM, and the Act provides a right of review in this court and the Federal Circuit. *See* 42 U.S.C. § 300aa-12(e)–(f). If the OSM does not issue a decision within 240 days of the filing of the petition, the petitioner may elect to leave the program and sue elsewhere under state law. *Id.* § 300aa-21(b)(1).[21] And if this court does not enter judgment within 420 days of the initial petition, the petitioner may also elect to leave the program and sue elsewhere under state law. *Id.* § 300aa-21(b)(2). An unhappy petitioner can even elect to leave the program and seek relief elsewhere *after* this court's judgment becomes final. *Id.* § 300aa-21(a); *Terran*, 195 F.3d at 1307 n.1.[22] The only limitation is that such a claim must "be brought within the period prescribed by limitations of actions" under the applicable state law. 42 U.S.C. § 300aa-21(c). Congress protected court access here as well—any state law statute of limitations is stayed from the date the petition is filed with OSM until the petitioner elects to leave the program. *Id.* § 300aa-16(c). Taken together, the Act does not prohibit any petitioner from pursuing claims under state law in other venues if he or she chooses.

---

[21] There are certain periods that are exempted from the calculation of these timing provisions. *See* 42 U.S.C. § 300aa-21(b).

[22] If a petitioner thinks that a final monetary judgment is too low, he or she may elect to forgo this court's judgment and sue elsewhere. *Id.* § 300aa-21(a)(1).

As the First Circuit explained, the Act:

> discourages victims from bringing those traditional tort cases by
> providing fairly generous, more easily obtainable, Vaccine Court
> awards.  A victim who obtains such an award may hesitate to give
> up that bird in the hand in return for a larger, but more speculative,
> tort law award.  And, a petitioner to whom the Vaccine Court gives
> nothing may see no point in trying to overcome tort law's yet more
> serious obstacles to recovery.

*Schafer v. Am. Cyanamid Co.*, 20 F.3d 1, 4–5 (1st Cir. 1994).  This is not unconstitutional.  *Milik v. Sec'y of Health & Hum. Servs.*, 822 F.3d 1367, 1378 (Fed. Cir. 2016) (rejecting the argument, based in part on *Bruesewitz*, that the Vaccine Act is unconstitutional); *Terran*, 195 F.3d at 1311 (rejecting a constitutional challenge to the Act); *H.L. v. Sec'y of Health & Hum. Servs.*, 129 Fed. Cl. 165, 176 (2016) ("[T]he Vaccine Act does not deny a Petitioner access to an Article III court.").  Thus, even if the Petitioner could bring his constitutional challenges now, they would fail.

<div align="center">***</div>

A court must enforce a judgment unless it "clearly proves . . . to be against conscience." *Marine Ins. Co. v. Hodgson*, 11 U.S. 332, 336 (1813) (Marshall, C.J.).  That occurs when a party shows its adversary "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier of fact of unfairly hampering the presentation of the opposing party's claim or defense." *Aoude II*, 892 F.2d at 1119.  Because the Petitioner has not met his heavy burden, his claim of fraud on the court fails.

## IV.   Conclusion

For these reasons, the court **DENIES** the Petitioner's motion for relief from judgment, ECF No. 118.

It is so ORDERED.

<div align="right">s/ Edward H. Meyers<br>Edward H. Meyers<br>Judge</div>